**BROWNE GEORGE ROSS LLP**
Eric M. George (State Bar No. 166403)
  egeorge@bgrfirm.com
Carl Alan Roth (State Bar No. 151517)
  croth@bgrfirm.com
Ryan D. Evans (State Bar No. 295600)
  revans@bgrfirm.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, CA 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

**KELLER LENKNER LLC**
Ashley C. Keller (*admitted pro hac vice*)
  ack@kellerlenkner.com
Aaron M. Zigler (State Bar No. 327318)
  amz@kellerlenkner.com
150 N. Riverside Plaza, Suite 4270
Chicago, IL 60606
Telephone: (312) 741-5222

*Counsel for Lead Plaintiff Matis Nayman and*
*Lead Counsel for the Class*

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| SPENCER WONG, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ARLO TECHNOLOGIES, INC., MATTHEW McRAE, CHRISTINE M. GORJANC, PATRICK C.S. LO, ANDREW W. KIM, NETGEAR, INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INC., DEUTSCHE BANK SECURITIES INC., GUGGENHEIM SECURITIES LLC, RAYMOND JAMES & ASSOCIATES, INC., COWEN AND COMPANY, LLC and IMPERIAL CAPITAL, LLC,<br><br>Defendants. | Case No. 5:19-cv-00372-BLF<br><br>**CLASS ACTION**<br><br>**SECOND AMENDED COMPLAINT**<br><br>Date: _____<br>Time: _____<br>Courtroom: 3, 5th Floor<br>Judge:    Hon. Beth L. Freeman |

Lead Plaintiff Matis Nayman ("Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by Lead Plaintiff's undersigned attorneys, for Lead Plaintiff's second amended complaint against Defendants, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Arlo Technologies, Inc. ("Arlo" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Lead Plaintiff believes that substantial evidentiary support exists for the allegations set forth herein and will be produced after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of persons and entities who purchased or otherwise acquired Arlo common stock pursuant or traceable to Arlo's false and misleading Registration Statement and Prospectus (collectively, the "Registration Statement") issued in connection with Arlo's August 2018 initial public offering (the "IPO" or the "Offering") (the "Securities Class Period"), as well as on behalf of all persons and entities who purchased common stock of Arlo during the period from and including August 3, 2018 through December 3, 2018 (the "Exchange Class Period") and who were damaged thereby. Lead Plaintiff seeks to pursue remedies against Arlo; its former controlling shareholder, NETGEAR, INC. ("NETGEAR"); certain of Arlo's officers and directors; and the IPO underwriters, under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

**The Company**

2.     Arlo is headquartered in San Jose, California. The Company provides smart connected devices that can purportedly monitor environments in real time using its cloud-based platform. This is accomplished by using a Wi-Fi or cellular network Internet connection in the Americas, Europe, the Middle East, Africa, and the Asia Pacific regions. By using Arlo's cloud-

based platform, consumers may engage in real time with their families and businesses from any location with an internet connection. Arlo also offers Wi-Fi- and LTE-enabled cameras, advanced baby monitors, and smart security lights.

**The Arlo IPO**

3.      On August 6, 2018, Arlo filed with the SEC its prospectus for its upcoming IPO, which forms part of the Registration Statement. Arlo sold 11,747,250 shares of common stock at $16.00 per share in its IPO, for proceeds of approximately $167.4 million, net of underwriting discounts and commissions, purportedly to be used for general corporate purposes.

4.      Before the IPO, Arlo was a wholly-owned subsidiary of Defendant NETGEAR. NETGEAR offers products enabling networking, broadband access, and network connectivity. NETGEAR owned approximately 84.2% of the shares of Arlo's outstanding common stock after the IPO.  As discussed below, NETGEAR spun off the rest of its Arlo shares to its shareholders at the end of 2018.

**The Importance of Arlo's Gross Margins and Product Innovation**

5.      At all relevant times, the size of Arlo's gross margins was very important to the Company and the market.  Thus, Arlo endeavored to maximize the number of products sold, while keeping its premium prices high and minimizing its marketing expenses.  Prior to the IPO, Arlo's gross margins were trending upwards, with the Company achieving gross margins of 25% in fiscal year 2017, up from 21% in fiscal year 2016.  Analysts expected that margins would continue to trend upwards, reaching 28% by fiscal year 2020.

6.      Also, to succeed as a standalone public company, Arlo needed to continuously launch innovative products.  For example, according to the Registration Statement, "***the average selling prices of our products typically decrease rapidly over the sales cycle of the product, which may negatively affect our revenue and gross margin***." Thus, "[i]n order to sell products that have a falling average unit selling price and maintain margins at the same time, ***we need to .***

*. . . continually introduce new products with higher sales prices and gross margin in order to maintain our overall gross margin*.”  [Emphasis added.]

7.     The Registration Statement, however, contained many materially false statements or omitted material information relating to, *inter alia*, the Company's ability to innovate new products, charge premium prices and maintain its gross margins.  For example, according to the Registration Statement: “*To date, product introductions have had a significant positive impact on our operating results due primarily to increases in revenue associated with sales of the new products in the quarters following their introduction. . . . The majority of our revenue to date has been derived from the sale of our Arlo cameras with new product introductions contributing significantly to revenue growth in the quarters following their introduction.  In the future, we plan to continue to introduce new categories of devices and services that will connect to and complement the Arlo platform, and we expect that our operating results will be impacted by these releases.”* [Emphasis added.]

*8.*     Furthermore, acording to the Registration Statement: “*We believe that we can continue to charge a premium price over competing products because of our superior product features . . . Since the launch of the original Arlo Security Camera in December 2014, we have introduced six additional Arlo devices, and we plan to continue to launch new camera and non-camera products and services to the Arlo ecosystem and grow our number of registered users and subscribers*.”  [Emphasis added.]

9.     The Registration Statement also highlighted the importance of launching new products during the holiday season: “*Seasonality—Historically, we have generated higher revenue in the third and fourth quarters of each year compared to the first and second quarters due to seasonal demand from consumer markets primarily relating to the beginning of the school year and the holiday season.*  For example, for the years ended December 31, 2017 and 2016, our third and fourth quarters collectively represented 62.0% and 65.5%, respectively,

1    of our revenue for such years.  ***Therefore, timely and effective product and service***

2    ***introductions are critical to our results of operations***.”  [Emphasis added.]

3        10.     Importantly, the Registration Statement failed to disclose and/or misrepresented

4    that the Company was having problems innovating new products (including the “Arlo Ultra”

5    product under development), and that new Arlo products would not be available for sale during

6    the upcoming holiday season.  As a result, the Company’s older products would have to be

7    heavily promoted and marketed, devastating the Company’s gross margins, operating results and

8    stock price. Defendants knew or should have known that Arlo Ultra would not be available for

9    sale during the upcoming holiday season and that this failure was material to investors.

10   **Shortly After the IPO, Arlo Announces Reduced Financial Guidance and Poor Gross**

11   **Margins**

12       11.     For example, on or about October 25, 2018, the Company announced its earnings

13   for the third quarter of 2018.  That was the same quarter as the IPO.  During a conference call

14   discussing the 2018 third quarter results, Defendant Christine M. Gorjanc (“Gorjanc”), Arlo’s

15   Chief Financial Officer, shocked the market by providing materially reduced guidance for the

16   fourth quarter of 2018.  This reduced guidance included poor GAAP gross margins of only 13–

17   15%.

18       12.     On that call, Defendants admitted that the Company’s margins were substantially

19   eroding because there had been no new products in the pipeline for the enitrety of the fourth

20   quarter of 2018.  Thus, ARLO’s margin guidance was depressed due to decreasing margins on its

21   older products, with no new products being released for the holiday season.

22       13.     Following this surprising news, Arlo’s stock price fell from $14.46 to $12.68 per

23   share, a substantial decline from the IPO price of $16.00 per share.

24   **Arlo’s New Ultra Product**

25

26

27

28

14. On or about Friday November 30, 2018, ARLO introduced its new ARLO Ultra product that would purportedly deliver "ultimate level of protection with 4K Ultra HD resolution, integrated spotlight with color night vision, 180-degree viewing angle, and dual, noise-canceling microphones."

15. Just days later, however, on Monday December 3, 2018, Arlo reported a delay in shipments of Ultra, citing "a quality issue with the battery from one of its suppliers" that was supposedly discovered during the product's final testing phase.

16. As a result of the delay, Arlo again lowered its fourth quarter 2018 financial guidance, advising investors that it anticipated "net revenue to be in the range of $125 million to $130 million, non-GAAP gross margin to be approximately 10%, and non-GAAP operating loss to be approximately 20% of revenue." The original guidance had been $140 million to $150 million.

17. According to the December 3, 2018 press release, "*When the company provided its original business outlook and guidance for the fourth quarter of 2018 on October 28, 2018, it had expected that its new flagship wire-free security camera system, Arlo Ultra ('Ultra'), would commence commercial distribution in late November 2018.* During the product's final testing phase, however, the company discovered a quality issue with the battery from one of its suppliers. The issue has been resolved, but has caused a delay in the timing of Ultra shipments. The company now anticipates that Ultra will begin global commercial distribution in January of 2019." [Emphasis added.]

18. As an initial matter, and importantly, when Arlo introduced the Ultra product on Friday November 30, 2018, it failed to disclose the delay in the release of the product or the revised guidance. It is not, however, possible that Defendants only figured out that information over the weekend and announced it on Monday December 3, 2018. Thus, Arlo's November 30, 2018 statement was materially false and misleading.

19.     Furthermore, Arlo's December 3 statement, claiming that at the end of October it had expected Ultra would commence commercial distribution in late November 2018, contradicts Defendant Gorjanc's October 25, 2018 statements in which she stated that no new products would be coming to market during the 2018 fourth quarter: "normally we would have a new product in the market for all of Q4 and we separating from NETGEAR allowed us to have more R&D investment and a lot of those products you're going to see coming we've been talking about the spring reset. ***So really the majority of that promotion is that some of the products have been out there for quite a while and we don't have a big new one hitting in channel all of Q4 like we would normally have, like we had Pro2 last year I think introduced in September and I would say that's really the main reason***."  [Emphasis added.]

## Arlo's Stock Price is Decimated on the News and Analysts Slam the Company For Losing The Trust of Shareholders

20.     Following this news, Arlo's stock price plummeted $2.75 per share, or 22.86%, to close at $9.28 on December 3, 2018.  That represented a decline of $6.72, or approximately 42%, from the IPO price of $16.00 per share.

21.     On the heels of the December 3, 2018 Arlo Ultra delay news, Deutsche Bank issued a scathing report reducing its Arlo price target and scolding management: "***[Arlo] has had two negative surprises since it went public this summer (margin guide down on its 3Q18 earnings and this) and we believe management will need to put together a few consistent quarters, with no negative surprises, to gain back investor trust. . . . We also believe it is prudent to lower our valuation multiple as execution issues and an already changing business strategy has raised concern for investors. . . . Specific negative risks include market share gains by competitors, loss of market share if Arlo is not able to continue to release innovative products, a slowdown in connected home market growth, an inability to become profitable longer term, [and] operational issues post split . . .***"  [Emphasis added.]

22.     As set forth herein, Defendants made materially false and misleading statements regarding the Company's business and operations.  Importantly, the Registration Statement failed to disclose and misrepresented that the Company was having problems innovating new products, and that new Arlo products would not be ready for sale during the upcoming holiday season. Defendants knew or should have known at the time of these statements that new Arlo products would not be ready for sale during the upcoming holiday season. As a result, the older products would have to be heavily promoted and marketed, devastating the Company's gross margins, operating results and stock price.  This would allow Arlo's competitors to capitalize on the Ultra product's missed launch, thereby increasing their own market share.  Because of the foregoing, Arlo's fourth quarter 2018 results and consumer base would be negatively impacted. As a result, Arlo's Registration Statement was materially false and misleading at all relevant times.

23.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

### JURISDICTION AND VENUE

24.     The claims asserted herein arise under Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

26.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Arlo is headquartered in this district, and a significant portion of its actions and the subsequent damages took place in this district.

27.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

28.     Lead Plaintiff purchased or otherwise acquired Arlo common stock as described in his March 13, 2019 PSLRA certification, submitted with his PSLRA Lead Plaintiff application on or about March 25, 2019, and was damaged.

29.     Defendant Arlo is a Delaware corporation with its principal executive offices located at 3030 Orchard Parkway, San Jose, CA 95134.  Arlo's common stock trades in an efficient market on The New York Stock Exchange ("NYSE") under the ticker symbol "ARLO."

30.     Defendant Matthew McRae was, at all relevant times, the Chief Executive Officer of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

31.     Defendant Gorjanc was, at all relevant times, the Chief Financial Officer of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

32.     Defendant Patrick C.S. Lo was a Director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

33.     Defendant Andrew W. Kim was a Director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

34.     Defendants McRae, Gorjanc, Lo, and Kim are collectively referred to hereinafter as the "Individual Defendants."

35.     Defendant NETGEAR is a consumer electronics company based in San Jose, California.  NETGEAR is subject to liability as a seller and control person.  As the parent

Company of Arlo, NETGEAR owned 100% of Arlo's outstanding common stock prior to the IPO.  It sold approximately 16% of its Arlo interest in the IPO.  The Registration Statement identified NETGEAR as Arlo's "Controlling Shareholder" and listed numerous powers that NETGEAR had over Arlo, including "the power to determine matters submitted to a vote of our stockholders without the consent of [Arlo's] other stockholders."

36.     NETGEAR's Senior Vice President of Strategy, Defendant MacRae, became Arlo's CEO in connection with the IPO, and Defendant Gorjanc, NETGEAR's CFO, became Arlo's CFO in connection with the IPO.  These defendants reviewed and approved the Registration Statement.  They also particpated in making presentations about the IPO.  NETGEAR was financially motivated to undertake the IPO, which included transferring certain Arlo assets and liabilities, and raising a substantial amount of cash.

37.     In this regard, according to the Registration Statement: "We [ARLO] believe, and NETGEAR has advised us that it believes, that the separation, this offering and the distribution will provide a number of benefits to our business and to NETGEAR's business.  These intended benefits include improving the strategic and operational flexibility of both companies, increasing the focus of the management teams on their respective business operations and allowing each company to adopt the capital structure, investment policy and dividend policy best suited to its financial profile and business needs, and providing each company with its own equity currency to facilitate acquisitions and to better incentivize management.  In addition, as we will be a stand-alone company, potential investors will be able to invest directly in our business."

38.     The following defendants served as underwriters for the IPO and are collectively referred to herein as the "Underwriter Defendants": Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") (seller of 4,086,000 Arlo shares); Deutsche Bank Securities Inc. ("Deutsche") (seller of 3,064,500 Arlo shares); Guggenheim Securities LLC ("Guggenheim") (seller of 1,021,500 Arlo shares); Raymond James & Associates, Inc. ("Raymond James") (seller

of 1,021,500 Arlo shares); Cowen and Company, LLC ("Cowen") (seller of 510,750 Arlo shares); and Imperial Capital, LLC ("Imperial Capital") (seller of 510,750 Arlo shares).

39.     The Underwriter Defendants drafted and disseminated the materially false and misleading Registration Statement.  The Underwriter Defendants' failure to conduct adequate due diligence was a substantial factor leading to the harm complained of herein.  Pursuant to the Securities Act, the Underwriter Defendants are liable for the materially false and misleading statements in the Registration Statement.

40.     The Underwriter Defendants are investment banks that specialize, *inter alia,* in underwriting public IPOs of securities.  They shared more than $13 million in fees in connection with the IPO.  The Underwriter Defendants arranged a road show prior to the IPO during which they, and the Individual Defendants, met with potential investors and presented highly favorable information about the Company and its financial prospects.

41.     Representatives of the Underwriter Defendants also assisted Arlo and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Arlo, an undertaking known as a "due diligence" investigation.  During the course of their due diligence, the Underwriter Defendants had continual access to confidential corporate information concerning Arlo's operations, products and financial prospects.

42.     In addition, agents of the Underwriter Defendants met with Arlo's management, top executives, and outside counsel and engaged in drafting sessions of the Registration Statement prior to the IPO.  They determined (a) the terms of the IPO, including the price at which Arlo stock would be sold; (b) the language and disclosures to be used in the Registration Statement; and (c) what responses would be made to the SEC in connection with its review of the Registration Statement.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Arlo's management and top executives, the

1   Underwriter Defendants knew, or should have known, of Arlo's existing problems as detailed

2   herein.  The Underwriter Defendants caused the Registration Statement to be filed with the SEC

3   and declared effective.

4                          **SUBSTANTIVE ALLEGATIONS**

5   **Background Information**

6        43.    In 2012, NETGEAR acquired Avaak, a developer of wireless monitoring and

7   networking devices.  Avaak's main product was a wireless camera called "the Vue" and the

8   company had a platform called "the VueZone" for storage and notifications.  NETGEAR,

9   thereafter, transformed the Vue brand into "Arlo" and Arlo's first product, the "Arlo Security

10  Camera," was launched in December 2014.

11       44.    Arlo manufactured the following products at the time of its IPO:

12       a.  ***Arlo Security Camera***, released in the ***fourth quarter of 2014***, was the first
             commercially available 100% battery-operated Wi-Fi security camera with
13           720p HD video quality, IP65-rated weather resistance and night vision.

14       b.  ***Arlo Q and Arlo Q Plus***, released in the ***fourth quarter of 2015***, is an indoor
             wired solution that allows users to monitor their surroundings with 1080p HD
15           video quality.

16       c.  ***Arlo Pro***, released in the ***fourth quarter of 2016***, is Arlo's second generation
             battery-operated, IP65-rated weather-resistant Wi-Fi camera, which added
17           new features, including two-way audio and rechargeable batteries.

18       d.  ***Arlo Go***, released in the first quarter of 2017, is an LTE-enabled wire-free
             camera that provides mobile monitoring supported by major networks in
19           markets around the world.

20       e.  ***Arlo Baby***, released in the second quarter of 2017, includes features such as
             air quality and temperature sensors, motion and audio detection, and advanced
21           night vision, intended for use by parents and caregivers.

22       f.  ***Arlo Pro 2***, released in the ***fourth quarter of 2017***, is a battery-operated, IP65-
             rated weather-resistant Wi-Fi camera and includes advancements in sound and
23           motion detection.

24       g.  ***Arlo Security Light***, released in the second quarter of 2018, delivers wire-free
             lighting that works intelligently both by itself or when paired with Arlo's
25           cameras.

h. ***Arlo Audio Doorbell and Arlo Chime***, released in the third quarter of 2018, are engineered to work as a standalone smart audio doorbell solution or to pair with any Arlo camera or Arlo Security Light for a more complete view of the entryway.

45.     Importantly, as illustrated above, to maximize its financial results, Arlo issued a new product in each of the fourth quarters of 2014–2017, in advance of the holiday season.  The Registration Statement highlighted that the fourth quarter product releases were the most effective financially.

46.     After NETGEAR created Arlo, sales ramped up quickly with Arlo hitting $10 million in cumulative sales by the 2015 first quarter and $100 million by first quarter of 2016. Arlo released its wired camera family, the "Arlo Q" and "Arlo Q Plus," in the fourth quarter of 2015 and the "Arlo Baby" in the second quarter of 2017.  Since then, Arlo has launched a number of new products in its wireless camera family, including wireless audio doorbells.

47.     The majority of Arlo's 2017 revenue—92% of fiscal year 2017 sales—was derived from the sale of its hardware products.  Services made up the remaining 8% of fiscal year 2017 sales, which was comprised of the free services included in the price of an Arlo camera, as well as Arlo's paid subscription services.  Included in the price of Arlo's cameras are free subscription services, including 7 days of cloud storage, which Arlo carves out and recognizes in its services business segment over a three-year period.  Paid subscription services for the Arlo Smart platform and other services are recognized in the services business over the time period of the subscription.

48.     At all relevant times, the size of Arlo's gross margins was paramount.  Thus, Arlo endeavored to maximize the number of products sold, while charging premium prices, and minimizing its marketing and promotional expenses.  Prior to the IPO, Arlo's gross margins were trending upwards, with the Company achieving gross margins of 25% in fiscal year 2017, up

from 21% in fiscal year 2016.  Analysts expected that margins would continue to trend upwards, reaching 28% by fiscal year 2020.

49.     Arlo sold most of its products through "channel partners," including Best Buy, Amazon, Costco, Walmart, AT&T, Verizon, Telstra and HSN.

50.     Arlo's principal competitors include Amazon (Blink and Ring), Google (Nest), Swann, Night Owl, Foxconn Corporation (Belkin), Samsung, D-Link and Canary.  According to the Registration Statement, "if any of these companies are successful in competing against us, our sales could decline, our margins could be negatively impacted and we could lose market share, any of which could seriously harm our business, financial condition and results of operations."  However, as discussed herein, Arlo affirmatively stated that it would succeed because of its innovation and leadership in the space.

51.     To succeed as a standalone public company, however, Arlo needed to continuously launch innovative products.  For example, according to the Registration Statement, "***the average selling prices of our products typically decrease rapidly over the sales cycle of the product, which may negatively affect our revenue and gross margin***."  Thus, "[i]n order to sell products that have a falling average unit selling price and maintain margins at the same time, ***we need to . . . . continually introduce new products with higher sales prices and gross margin in order to maintain our overall gross margin***."  [Emphasis added.]

52.     As acknowledged by Deutsche Bank in a report created around the time of the IPO, "Lack of product innovation: The smart camera and connected home markets are emerging, highly competitive, and quickly changing markets.  If Arlo doesn't continue to release highly innovative products, the company may lose share."  Thus, as set forth herein, Arlo represented in the Registration Statement that it would continue to release innovative products.  Arlo, however, at the time of the IPO, and, thereafter, was having a difficult time with the development and

release of new products, including its upcoming Arlo Ultra product.  Defendants knew oe should

have known but failed to publicly disclose that information.

53.     On July 31, 2018, Arlo filed with the SEC its final amendment to the Registration

Statement on Form S-1/A, which forms part of the Registration Statement.  The Registration

Statement was declared effective on August 2, 2018.

54.     On August 6, 2018, Arlo filed with the SEC its prospectus for its upcoming IPO,

which forms part of the Registration Statement.  Arlo sold 11,747,250 shares of common stock at

$16.00 per share in its IPO, for proceeds of approximately $167.4 million, net of underwriting

discounts and commissions, purportedly to be used for general corporate purposes.

55.     As set forth herein, the Registration Statement and Prospectus for the IPO were

negligently prepared and, as a result, omitted facts necessary to make the statements made not

misleading, and were not prepared in accordance with the rules and regulations governing their

preparation.  Under applicable SEC rules and regulations, the Registration Statement was

required to disclose known trends, events, or uncertainties that were having, and were reasonably

likely to have, an impact on Arlo's continuing operations.  Defendants failed to do so.

**Shortly After the IPO, Arlo Announces Materially Reduced Guidance for the Fourth Quarter of 2018**

56.     On or about October 25, 2018, shortly after the IPO in which Arlo touted its

premium products and innovation, the Company announced its earnings for the third quarter of

2018.  Indeed, the earnings announcement was during the same quarter of the IPO.  In

conjunction therewith, during a conference call discussing the 2018 third quarter results,

Defendant Gorjanc shocked the market by setting out reduced guidance for the fourth quarter of

2018—reflecting poor GAAP gross margins of 13–15%:

> Turning to guidance for the fourth quarter of 2018, we continue to believe that
> rapidly acquiring registered users in this new market is a key to success of our
> business model and we will accelerate this push in Q4 2018.  We expect revenue
> to be in the range of $140 million to $155 million.  ***Together with our key***

**channel partners we are planning for a strong holiday season** and expect it will be more promotional than in prior years.  The holiday period is no longer limited to a few days.  We start in October with several targeted promotions and move on to the week's long selling period of Black Friday and Cyber Monday and finish it off with the December holiday push.  **With these activities we expect our GAAP gross margin to come in between 12.4% and 14.4% and our non-GAAP gross margin to come in between 13% and 15% in the fourth quarter of 2018.**  As you would expect, given our consumer market focus, I'd like to remind everyone that we will see seasonality in our business as we enter the first half of 2019.

[Emphasis added.]

57.     On that call, defendants admitted that the Company's gross margins would be substantially reduced because ARLO would not have a new flagship product to tout for all of the fourth quarter of 2018, and the older Arlo products, which were less desirable, would be costlier to promote and sell:

[Analyst] Adam Tindel
I guess I'm a little surprised to see revenue growth not accelerating with that level of gross margin decline is there a reason that we wouldn't—why would revenue growth be decelerating year-over-year with such a decline in gross margin year-over-year. Thanks.

Christine Gorjanc
. . . **normally we would have a new product in the market for all of Q4** and we separating from NETGEAR allowed us to have more R&D investment and a lot of those products you're going to see coming we've been talking about the spring reset.  So really the majority of that promotion is that some of the products have been out there for quite a while and **we don't have a big new one hitting in channel all of Q4 like we would normally have**, like we had Pro2 last year I think introduced in September and I would say that's really the main reason.

[emphisis added]

58.     There was also discussion on the call about the continuing cost to "promote" the sale of ARLO's older products and that newer products would not need as much promotion (but were not being released for the holiday season, but would be released for "Spring reset"):

Christine Gorjanc
No, I say it's again we're being more promotional than we were in Q1 say take for example Q1 of 2018 we're going to continue to be more promotional even that is really our older products we were being promotional with those as we move ahead and coming in for the new ones that we expect to see on spring reset and obviously beyond that too.  So I think it's really more that combination of more

promotional because some of the products are a little bit older as we go into the market.

\*\*\*

I would tell you Q4 gross margin is always a bit of an outlier and it is how much we decide to participate in Black Friday and Cyber in that ***and I say so a little bit exasperated by again that the product line being a little bit older if I have a brand new product out in Q4 you can bet I'm not going to be promoting that***.

[emphsis added]

59.     Thus, ARLO represented that it expected revenue to be in the range of $140 million to $155 million on sales of its older products, with no new products being released for the holiday season.  This was quite a departure from the Registration Statement (and Arlo's past practices), which represented that Arlo would continuously release innovative new products especially around the holiday season.

60.     Following this news, Arlo's stock price fell from $14.46 to $12.68 per share, a substantial decline from the IPO price of $16.00 per share.

**NETGEAR Spins Off the Rest of Its Arlo Shares**

61.     On or about November 29, 2018, NETGEAR announced that it had approved a special stock dividend to its stockholders of its 62.5 million ARLO shares.  That distribution was set for December 31, 2018, for all NETGEAR shareholders of record as of December 17, 2018. Based on NETGEAR's 31.53 million shares outstanding, NETGEAR stockholders would receive about 1.98 ARLO shares for each NETGEAR share held.

**Arlo's Ultra Announcements**

62.     Then, on or about Friday November 30, 2018, contrary to its statements just a month before on October 25, 2018, ARLO announced a new flagship product: its new ARLO Ultra:

Next-generation Arlo Ultra delivers ultimate level of protection with 4K Ultra HD resolution, integrated spotlight with color night vision, 180-degree viewing angle, and dual, noise-canceling microphones

SAN JOSE, Calif., Nov. 30, 2018 /PRNewswire/ -- Arlo Technologies, Inc. (NYSE: ARLO), the #1 network connected camera brand, unveiled today its new flagship wire-free security camera system, Arlo Ultra.  Designed to provide the ultimate level of protection for the people and places that matter most, Arlo Ultra features 4K Ultra HD resolution with high dynamic range (HDR), color night vision and advanced image processing, all in a sleek, compact design built for outdoor and indoor use.  Arlo Ultra also includes a one-year subscription to Arlo Smart Premier, giving users a more personalized, intelligent smart home security experience, powered by Arlo's sophisticated AI and computer vision technologies.  The new Arlo Ultra 4K HDR wire-free security camera system is slated to roll out to the market in the first quarter of 2019, with pricing starting at $399.99 for the 1-camera system which includes a one-year subscription to Arlo Smart Premier.

63.     The ARLO Ultra was not mentioned by ARLO prior to this announcement.

64.     Just days after the November 30 unveiling of Ultra—on Monday December 3, 2018—Arlo reported a delay in shipments of Ultra, citing "a quality issue with the battery from one of its suppliers" that was supposedly discovered during the product's final testing phase.

65.     As a result of the delay, Ultra once again lowered its fourth quarter 2018 financial guidance, advising investors that it anticipated "net revenue to be in the range of $125 million to $130 million, non-GAAP gross margin to be approximately 10%, and non-GAAP operating loss to be approximately 20% of revenue."  The original guidance had been $140 million to $150 million.

66.     ARLO cut its guidance by $20 million with only one month left in the fourth quarter based on the delay of a product that had never been mentioned.

67.     On this news, ARLO shares dropped $2.75 per share, or over 22%, to close at $9.28 per share on December 3, 2018.

68.     The full December 3, 2018 press release states:

Arlo Provides Update to Fourth Quarter 2018 Business Outlook

SAN JOSE, Calif.--(BUSINESS WIRE)-- Arlo Technologies, Inc. (NYSE: ARLO), the award-winning, industry leader that is transforming the way people experience the connected lifestyle, today updated its fourth quarter 2018 outlook. *When the company provided its original business outlook and guidance for the fourth quarter of 2018 on October 28, 2018, it had expected that its new*

*flagship wire-free security camera system, Arlo Ultra ("Ultra"), would commence commercial distribution in late November 2018.*  During the product's final testing phase, however, the company discovered a quality issue with the battery from one of its suppliers.  The issue has been resolved, but has caused a delay in the timing of Ultra shipments.  The company now anticipates that Ultra will begin global commercial distribution in January of 2019.  "While we are disappointed to delay sales of our exciting new product, Ultra, customer satisfaction is our number one priority and we took action to ensure we continue to bring the best products to the market.  Arlo is a leader in the market not only because of our incredible product feature set and ease-of-use, but also our quality and reliability," said Matthew McRae, Chief Executive Officer of Arlo Technologies, Inc.  "In final testing, we determined the battery from one of our suppliers did not meet our performance requirements.  We therefore decided to delay product shipment until the issue had been resolved and we were confident that the battery meets our high quality standards.  This will produce a short term delay in the growth and profitability we were expecting, but I remain confident our long term trajectory remains intact."

Fourth Quarter 2018 Outlook
As a result of the Ultra shipment delay Arlo is updating its fourth quarter 2018 financial guidance.  The company now expects its fourth quarter 2018 net revenue to be in the range of $125 million to $130 million, non-GAAP gross margin to be approximately 10%, and non-GAAP operating loss to be approximately 20% of revenue.

Ultra features 4K Ultra HD resolution with HDR, color night vision and advanced image processing, all in a sleek, compact design built for both indoor and outdoor use.  Ultra also includes a 1-year subscription to Arlo Smart Premier, giving users a more personalized, intelligent smart home security experience, powered by Arlo's sophisticated AI and computer vision technologies.

69.     As an initial matter, and importantly, when Arlo introduced the Ultra product on Friday November 30, 2018, it failed to disclose the delay in the release of the product or the revised guidance.  It is not plausible that Defendants only figured out that information over the weekend and announced it on Monday December 3, 2018.   Thus, Arlo's announcement of the ARLO Ultra on November 30, 2018 was materially false and misleading.

70.     Furthermore, Arlo's December 3 statement claiming that, at the end of October, it had expected Ultra would commence commercial distribution in late November 2018, contradicts defendant Gorjanc's October 25, 2018 statements in which she stated that no new products would be coming to market during the 2018 fourth quarter: "normally we would have a

new product in the market for all of Q4 and we separating from NETGEAR allowed us to have more R&D investment and a lot of those products you're going to see coming we've been talking about the spring reset. ***So really the majority of that promotion is that some of the products have been out there for quite a while and we don't have a big new one hitting in channel all of Q4 like we would normally have, like we had Pro2 last year I think introduced in September and I would say that's really the main reason***." On that call, Gorjanc also stated I'm "***a little bit exasperated by again that the product line being a little bit older if I have a brand new product out in Q4 you can bet I'm not going to be promoting that***."  [Emphasis added.]

71.     Moreover, it is unlikely that the battery issue arose only at the final testing stage of the product.  As an initial matter, Arlo knew for years that its products, such as the Arlo Pro and Arlo Pro 2, had experienced battery issues.  The Arlo Pro and Arlo Pro 2 used rechargeable batteries.  The batteries for the Arlo Pro and Pro 2 would unexpectedly go to zero volts and would be unrecoverable.  That was a battery design issue.  Thousands of batteries were being returned to Arlo.  The batteries had been designed by Arlo engineering, along with and certain suppliers called Outside Design Manufacturers.  Arlo would have been developing and testing the batteries for Arlo Ultra for at least 4 to 6 months, the typical time frame for the internal testing of Arlo's new products. Thus, it is hard to believe that the battery problem arose at the eleventh hour.

72.     Finally, the battery issue was simply the tip of the iceberg of Arlo Ultra's problems, which was rushed and not ready for primetime.  Indeed, the release of Ultra was quite troublesome: many firmware upgrades were issued and the Company stopped sales of the product.  In this regard, after its release, news reports surfaced that Arlo had pulled Ultra from wide sale at its main channel partner, Best Buy, and delayed a general release of the camera after numerous complaints about performance from early users.

73.     According to the February 6, 2019 Techhive.com article—*Arlo puts the brakes on its Arlo Ultra 4K security camera launch after early-adopter complaints*—the Arlo Ultra was first unveiled at CES in Las Vegas in January 2019, with units going on sale at Best Buy soon after.  However, "It didn't take long for customers to start registering complaints about wireless connectivity, battery life, and the ability to successfully stream in 4K.  The company has been working to fix the problems with several firmware updates in the last few weeks.  Arlo Ultra cameras saw new software on January 15, 20, 29, and 30, and software in the new companion base station was updated on January 15, 17, and 30.  But, due to the problems, the company has put the brakes on the Arlo Ultra and is opting to get the software right before releasing more of the cameras."  According to the article, Arlo Ultra was scheduled for a wider release in late January 2019, but BestBuy.com now lists the camera as "coming soon," and Amazon reports a release date of March 17.

74.     Given the numerous problems that were still plaguing the Arlo Ultra in January 2019, Defendants knew or should have known that Arlo would be unable to release the Arlo Ultra during the 2018 holiday season.

**Subsequent Arlo Disastrous Events**

75.     Given the spate of bad news revealed by Arlo in the short time since the IPO, on December 3, 2018, Deutsche Bank issued a scathing report reducing its Arlo price target and scolding management: "[Arlo] has had two negative surprises since it went public this summer (margin guide down on its 3Q18 earnings and this) and we believe management will need to put together a few consistent quarters, with no negative surprises, to gain back investor trust. . . . We also believe it is prudent to lower our valuation multiple as execution issues and an already changing business strategy has raised concern for investors. . . . Specific negative risks include market share gains by competitors, loss of market share if Arlo is not able to continue to release

1    innovative products, a slowdown in connected home market growth, an inability to become

2    profitable longer term, [and] operational issues post split . . ."

3           76.    On or about January 29, 2019, Cowen issued a report revealing that the Arlo Ultra

4    launch was a disaster:

5
        In regard to Ultra's launch at Best Buy, our field work suggests mixed to negative
6        reviews on the product as was reported by some customers as "buggy."  Initial
        reviews of the Arlo 4K Ultra camera are mixed according to online Best Buy
7        reviews, with the $999 4-pack camera system receiving 22% 5-star ratings and
        45% 1-star ratings.  This is a "halo" product for the Arlo brand given it is the only
8        4K consumer DIY camera in the market.  In regard to reviews, notably, only 33%
        of reviewers would refer the product to a friend.  Buyer issues and complaints,
9        many from existing Arlo customers who have upgraded from Pro systems to the
        Ultra 4K system, are around several issues including (a) signal strength, (b) added
10       cost for 4K cloud storage, and (c) picture quality. . . . Firmware updates have
        already been pushed to address some of the concerns to our understanding.  We
11       believe the signal strength and picture quality issues are tied together and can be
        improved via firmware updates; however, these initial reviews are concerning in
12       our view.

13
           77.    On or about February 5, 2019, Deutsche Bank issued another damning report
14
    entitled: "F4Q-18 results: Picture looks ugly in 1H19."  In that report, Deutsche Bank again took
15
    Arlo management to task for its multiple set-backs since going public (including the problematic
16
    Arlo Ultra launch)—set-backs that were specific to Arlo and not its competitors:
17

18
        Inventory issues and a slowing market to cause pain in 2019.
19

20       Arlo reported F4Q18 results that were in line with its negative preannouncement,
        but results were overshadowed by a dismal guide.  *At the midpoint, Arlo is*
21       *guiding F1Q19 revenue down 50% y/y as it deals with elevated inventory levels*
        *at its channel partners and a weakening market for IP cameras.*  Arlo does
22       expect inventory levels to normalize going into 2H19 and expects a stronger 2H
        aided by new product launches and the holiday season.  *While management sees*
23       *this 1H weakness as more of a temporary issue, we find the slowing market*
        *concerning especially since it is such a nascent market.  Additionally, it appears*
24       *Arlo will have to remain overly promotional to sell older inventory and keep its*
        *channel partner inventory at healthy levels.  We are also concerned with the*
25       *multiple setbacks the company has had since it went public, with the guide*
        *down in margins on its F3Q18 earnings call, issues with the launch of the Arlo*
26       *Ultra and the current inventory/market issues they are facing.*  Post results, we
        have brought our estimates down significantly and are lowering our price target to
27       $8 from $20 based on a EV/Sales multiple, well below the valuation of a
        comparable basket of publicly traded companies.
28

                                            -21-                    Case No. 5:19-cv-00372-BLF

\*\*\*\*\*

Areas to monitor 1) Arlo's revenue guide for F1Q19 represents a 50% y/y revenue decline as Arlo deals with high inventory levels at its channel partners.  2) Arlo is expecting gross margins between 0-3% in F1Q19 as it faces headwinds from increased promotional activity and underutilization.  3) The IP camera market appeared to slow meaningfully at the end of 2018, concerning considering how young the market is.  4) The FY19 guide, of $380-$420m (down -15% y/y), points to a better 2H, but the growth expectations for F2H19 are still well below the 20%+ growth rate that the Street was expecting for the company over the next 2 years.  5) The expectations for a weak 1H19 point to limited expectations for the newly launched Arlo Ultra.  6) Arlo has had multiple setbacks since becoming a public company and it could take a few more quarters of strong execution and results before investor interest in the name grows.

**_Lowering price target to $8; maintain Buy rating_**

We have lowered our price target to $8 from $20. We have lowered our sales estimates on the company outlook and moved our target multiple down on inventory issues, increased competition and concerns about a slowing connected home market.  Our $8 price target is based off 1.3x (down from 2.2x) our EV/FY-19 sales, ~1.5x below a comparable basket of publicly traded device and services growth companies.  **_We believe ARLO should trade at a discount to a comparable basket of publicly-traded device and services growth companies as ARLO faces headwinds from higher inventory in the channel and margin pressure from competition.  Specific negative risks include market share gains by competitors, loss of market share if Arlo is not able to continue to release innovative products, a slowdown in connected home market growth, an inability to become profitable longer term, operational issues post split, and lack of traction expanding internationally._**

[Emphasis added.]

78.    Arlo's share price was $7.52 the day this lawsuit was initially brought.  It is currently trading around $4.42 per share.

**<u>Materially False and Misleading Statements and Omissions</u>**

79.    The Registration Statement was negligently prepared and, as a result, included untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.  Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events, or uncertainties that were having, and

were reasonably likely to have, an impact on Arlo's continuing operations.  The Registration Statement failed to do so.

80.     For example, the Registration Statement contained materially false statements and omitted material information relating to the Company's ability to innovate new products, charge premium prices and maintain its leadership position and gross margins.  For example, according to the Registration Statement: "To date, product introductions have had a significant positive impact on our operating results due primarily to increases in revenue associated with sales of the new products in the quarters following their introduction. . . . The majority of our revenue to date has been derived from the sale of our Arlo cameras with new product introductions contributing significantly to revenue growth in the quarters following their introduction.  In the future, we plan to continue to introduce new categories of devices and services that will connect to and complement the Arlo platform, and we expect that our operating results will be impacted by these releases" and "we plan to continue to introduce new categories of smart connected devices to the Arlo platform in the near future."

81.     Furthermore, acording to the Registration Statement, in the section entitled "Our Growth Strategy," Arlo stated: "We believe that we can continue to charge a premium price over competing products because of our superior product features . . . Since the launch of the original Arlo Security Camera in December 2014, we have introduced six additional Arlo devices, and we plan to continue to launch new camera and non-camera products and services to the Arlo ecosystem and grow our number of registered users and subscribers."

82.     According to the Registration Statement, the "key elements of our growth strategy are to **Continue to Innovate and Grow Our Installed Base**.  We have brought numerous leading and innovative new products to market, such as our wire-free, weather-resistant internet protocol ('IP') cameras, lights and the first commercially available LTE-enabled camera.  **We plan to**

*expand the Arlo ecosystem and grow our installed base by continuing to innovate on our current product lines and by expanding into adjacent categories*."  [Emphasis added.]

83.     Also, according to the Registration Statement, "We expect to increase our investment in research and development *as we continue to introduce new and innovative products and services to enhance the Arlo platform*."  [Emphasis added.]

84.     The Registration Statement also highlighted the importance of launching new products during the holiday season: "*Seasonality—Historically, we have generated higher revenue in the third and fourth quarters of each year compared to the first and second quarters due to seasonal demand from consumer markets primarily relating to the beginning of the school year and the holiday season.*  For example, for the years ended December 31, 2017 and 2016, our third and fourth quarters collectively represented 62.0% and 65.5%, respectively, of our revenue for such years.  *Therefore, timely and effective product and service introductions are critical to our results of operations.*"  [Emphasis added.]

85.     In addition, despite having an inventory of older products, and having trouble innovating new products, necessitating higher promotional costs and larger inventories at their points of sale, the Registration Statement stated:

Our Competitive Advantages—What Sets Us Apart

- Best-in-Class Technology. Our engineers continually push the boundaries of innovation to develop products that leverage our cutting-edge technological capabilities, including our RF connectivity expertise, power management expertise, sleek, weather-resistant product design, broad compatibility, cloud-based platform and AI.

                              ***

- The Arlo Brand and Channel Partners. Arlo's strong brand recognition, along with its deep and long-standing channel partnerships established under NETGEAR, have enabled us to feature Arlo products prominently across our distribution channels. In addition, we have a significant share of shelf space with our channel partners, including U.S. retail and mobile operators.

86.     While Arlo had a glut of old products on the shelf going into the 2018 fourth quarter (with no new products forthcoming), the Registration Statement omitted that material information.  Instead, it just provided an insufficient boilerplate warning about what would happen if that occurred:

> ***If we do not effectively manage our sales channel inventory and product mix, we may incur costs associated with excess inventory, or lose sales from having too few products.***
>
> If we are unable to properly monitor, control and manage our sales channel inventory and maintain an appropriate level and mix of products with our distributors and within our sales channels, we may incur increased and unexpected costs associated with this inventory.  We generally allow distributors and traditional retailers to return a limited amount of our products in exchange for other products. Under our price protection policy, if we reduce the list price of a product, we are often required to issue a credit in an amount equal to the reduction for each of the products held in inventory by our wholesale distributors and retailers.  ***If our wholesale distributors and retailers are unable to sell their inventory in a timely manner, we might lower the price of the products, or these parties may exchange the products for newer products.  Also, during the transition from an existing product to a new replacement product, we must accurately predict the demand for the existing and the new product.  . . . . If we improperly forecast demand for our products, we could end up with too many products and be unable to sell the excess inventory in a timely manner***, if at all, or, alternatively, we could end up with too few products and not be able to satisfy demand.  This problem is exacerbated because we attempt to closely match inventory levels with product demand, leaving limited margin for error.  If these events occur, we could incur increased expenses associated with writing off excessive or obsolete inventory, lose sales, incur penalties for late delivery or have to ship products by air freight to meet immediate demand, thereby incurring incremental freight costs above the sea freight costs, a preferred method, ***and suffering a corresponding decline in gross margin.***

[Emphasis added.]

87.     The Registration Statement also stated that because of Arlo's "leading technology," the Company would succeed against its competition and would extend its market leadership:

> We believe that the combination of our leading technology and our decades of experience gained from operating within a highly successful consumer electronics

company positions us well against the competition and to be successful as an independent company.

                                        \*\*\*

In addition to global expansion opportunities, we believe we are well-positioned to extend our current market leadership to the broader connected lifestyle market both within and beyond the home as we continue to launch new product lines and services within our connected lifestyle platform.

88.      Finally, while the Ultra product had problems because of purported battery issues (as did the Arlo Pro and Pro 2), the Registration Statement touted the Company's supposed proficiency for innovation, including the quality of its work with batteries for its products:

Benefits of Our Solutions

Our products and solutions offer a unique set of capabilities that address a growing market opportunity, which has resulted in rapid user adoption and has enabled Arlo to become the current leader in the U.S. consumer network connected camera systems market.  Our products and solutions offer the following benefits:

***Versatility***. Our existing devices are wireless, wire-free, ***battery-operated*** and weather-resistant for ease of outdoor use and placement in hard-to-access areas. Utilizing our leading RF technology expertise, we believe our smart connected devices have greater range and stronger connectivity than our principal competitors' products, allowing users to place devices farther away from their Wi-Fi source than would otherwise be possible.  ***Furthermore, our devices are equipped with rechargeable batteries and proprietary power management software to increase battery life***.

                                 \* \* \*

Arlo's power management expertise, encompassing hardware product design, software and firmware, minimizes power consumption in our devices. Motion-activated on/off sensors ***prolong the devices' overall battery life***, and our patented low-power Wi-Fi technology ***also minimizes battery usage*** before and during video transmission. As a result, our users typically only need to recharge their Arlo devices every three to six months, leading to flexible indoor and outdoor placement options.

[Emphasis added.]

89.      The statements referenced in ¶¶ 76–85 above were materially false or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, and operational and financial results, which were known to Defendants or recklessly disregarded by them.  As set forth herein, Defendants made materially false and

misleading statements regarding the Company's business and operations.  Importantly, the Registration Statement failed to disclose that the Company was having problems innovating new products, and that new Arlo products would not be ready for sale during the upcoming holiday season.  As a result, the older products would have to be heavily promoted and marketed, devastating the Company's gross margins, operating results and stock price.  This would allow Arlo's competitors to capitalize on the Ultra product's missed launch, thereby increasing their own market share.  These statements were false and misleading at the time there were made because, as as Christine Gorjanc admitted on October 25, " . . normally we would have a new product in the market for all of Q4 … and we don't have a big new one hitting in channel all of Q4 like we would normally have[.]"  And as ARLO admitted on December 3, 2018, When the company provided its original business outlook and guidance for the fourth quarter of 2018 on October 28, 2018, it had expected that its new flagship wire-free security camera system, Arlo Ultra ("Ultra"), would commence commercial distribution in late November 2018.

90.     Because of the foregoing, *inter alia*, Arlo's fourth quarter 2018 results and consumer base would be negatively impacted.  As a result, Arlo's Registration Statement was materially false and misleading at all relevant times.

91.     Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii), requires defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations."  The failure of the Registration Statement to disclose the inventory and innovation issues violated 17 C.F.R. § 229.303(a)(3)(ii), because these undisclosed facts were known to Defendants and would (and did) have an unfavorable impact on the Company's sales, revenue and income from continuing operations.

**Additional Allegations Applicable Only To Exchange Act Claims**

92.     Lead Plaintiff makes the additional allegations contained in paragraphs 88 to 92 with respect to his claims under Sections 10(b) and 20(a) of the Exchange Act only.  Lead plaintiff disclaims any reliance upon these allegations or incorporation of these allegations in his Securities Act claims.

93.     Arlo and the Individual Defendants made the statements contained in the Registration Statement because Arlo is the Issuer of the statements and each of the Individual Defendants signed his or her name to those statements, indicating that he or she was a maker thereof.

94.     Additional aspects of the Defendants' conduct indicate that they made at least the most significant misrepresentations and omissions contained in the Registration statement with either deliberate recklessness or with fraudulent intent.  All of the Individual Defendants were intimately involved in the day-to-day management of the Company.

95.     After the IPO, the Individual Defendants continued to recklessly mislead investors about the Company's prospects and products.  These misrepresentations included the November 30, 2018 press release which failed to disclose the problems with Ultra and the reduced financial guidance as a result thereof.  As a result of the December 3, 2018 corrective disclosure, the price of Arlo stock dropped materially.

96.     Defendants' December 3, 2018 corrective statement represented that Arlo's October 2018 revised financial guidance reflected the release of Ultra during the 2018 fourth quarter.  However, during the October 2018 earnings call, Defendant Gorjanc blamed the reduced guidance on the fact that no new products were being released in the 2018 fourth quarter.  If Ultra was actually scheduled to be released during the 2018 fourth quarter, Gorjanc's October 2018 statements were materially false and misleading, with the channel inventory and promotional costs higher than even disclosed.

**LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS**

97.     Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class of persons and entities who purchased or otherwise acquired Arlo common stock pursuant or traceable to Arlo's false or misleading Registration Statement issued in connection with the IPO (the Securities Class Period), as well as on behalf of all persons and entities who purchased Arlo common stock during the period from and including August 3, 2018 through December 3, 2018 (the Exchange Class Period), who were damaged thereby.  Excluded from the Class are Defendants and their family members, directors and officers of Arlo and their families and affiliates.

98.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Arlo has millions of shares of stock outstanding, owned by hundreds or thousands of persons.

99.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)  Whether the Securities Act and the Exchange Act were violated by Defendants;

(b)  Whether Defendants omitted or misrepresented material facts;

(c)  Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)  Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)  Whether the price of Arlo common stock was artificially inflated; and

(f)  The extent of damage sustained by Class members and the appropriate measure of damages.

100.    Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

101.    Lead Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Lead Plaintiff has no interests which conflict with those of the Class.

102.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I
### (Violations of Section 11 of the Securities Act
Against Arlo, the Individual Defendants and the Underwriter Defendants)

103.    Lead Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 87 as if fully set forth herein.  The allegations contained in Paragraphs 88 through 92 are expressly excluded from this claim, which does not allege fraud, recklessness or intentional misconduct.

104.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Arlo, the Individual Defendants, and the Underwriter Defendants.

105.    The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein, as identified in Paragraphs 76 to 85.

106.    Arlo is the registrant for the IPO.  The Individual Defendants and the Underwriter Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

107.    As issuer of the shares, Arlo is strictly liable to Plaintiff and the Class for the misstatements and omissions, as identified in Paragraphs 76 to 85.

108.     The Individual Defendants and the Underwriter Defendants named herein did not make a reasonable investigation or did not possess reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omission of any material facts and were not misleading.

109.     By reasons of the conduct herein alleged, each Individual Defendants and the Underwriter Defendants violated, or controlled a person who violated Section 11 of the Securities Act.

110.     Lead Plaintiff acquired Arlo securities pursuant or traceable to the Registration Statement for the IPO.

111.     Lead Plaintiff and the Class have sustained damages.  The value of Arlo securities has declined substantially subsequent to and due to Arlo and the Individual Defendants' violations.

**COUNT II**
**(Violations of Section 15 of the Securities Act**
**Against the Individual Defendants and NETGEAR)**

112.     Lead Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 87 as if fully set forth herein.  The allegations contained in Paragraphs 88 through 92 are expressly excluded from this claim, which does not allege fraud, recklessness or intentional misconduct.

113.     This count is asserted against the Individual Defendants and NETGEAR and is based upon Section 15 of the Securities Act.

114.     The Individual Defendants and NETGEAR, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Arlo within the meaning of Section 15 of the Securities Act.  The Individual Defendants and NETGEAR had the power and influence and exercised the same to cause Arlo to engage in the acts described herein.  The Individual Defendants' and NETGEAR's

1  positions made them privy to and provided them with actual knowledge of the material facts

2  concealed from Lead Plaintiff and the Class, as identified in Paragraphs 76 to 85.

3     115.   By virtue of the conduct alleged herein, the Individual Defendants and

4  NETGEAR are liable for the aforesaid wrongful conduct and are liable to Lead Plaintiff and the

5  Class for damages suffered.

6

7                                   **COUNT III**
                          **(Violations of Section 10(b) and Rule 10b-5**
8                        **Against Arlo and the Individual Defendants)**

9     116.   Lead Plaintiff repeats and realleges the allegations contained in paragraphs 1 to 98

10  above as if fully set forth herein.

11     117.   This Count is asserted against Arlo and each of the Individual Defendants for

12  violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated

13  thereunder by the SEC.

14     118.   At the time of the Registration Statement and during the Class Period, Arlo and

15  the Individual Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant

16  to which they knowingly or recklessly engaged in acts, transactions, practices and courses of

17  business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the

18  Class; made various untrue statements of material fact and omitted to state material facts

19  necessary to make the statements made, in light of the circumstances under which they were

20  made, not misleading; and employed devices, schemes and artifices to defraud in connection

21  with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class

22  Period, did (i) deceive the investing public, including Lead Plaintiff and other Class members, as

23  alleged herein; (ii) artificially inflate and maintain the market price of  Arlo securities; and (iii)

24  cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire Arlo

25  securities at artificially inflated prices.

119.     Specifically, Arlo issued a Registration Statement, which each of the Individual Defendants signed, that was materially false and misleading.  Thereafter, the Individual Defendants continued to make materially false and misleading statements.

120.      By virtue of their positions at Arlo, the Individual Defendants had actual knowledge of the materially false and misleaading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other members of the Class; or, in the alternative, acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Arlo and the Individual Defendants.  In addition to the facts alleged herein demonstrating a strong inference of scienter, certain information showing that these Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Individual Defendants' knowledge and control.  As the senior managers or directors of Arlo, the Individual Defendants had knowledge of the details of Arlo's internal affairs.

121.     As officers and directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information regarding Arlo's business, operations, and financial controls.  As a result of the dissemination of the aforementioned false and misleading reports and filings, the market price of Arlo securities was artificially inflated throughout the Class Period.

122.     In ignorance of the adverse facts concerning Arlo's operations and financial controls that were concealed by the misrepresentations and omissions alleged herein, Lead Plaintiff and the other members of the Class purchased or otherwise acquired Arlo securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and statements disseminated by the Defendants, and were damaged thereby.

123. During the Class Period, Arlo securities were traded on an active and efficient market. Lead Plaintiff and the other members of the Class, directly relying on the materially false and misleading statements described herein, or relying upon the integrity of the market, purchased or otherwise acquired shares of Arlo securities at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and acquisitions by Lead Plaintiff and the Class, the true value of Arlo securities was substantially lower than the prices paid by Lead Plaintiff and the other members of the Class. The market price of Arlo securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and Class members.

124. By reason of the conduct alleged herein, Arlo and the Individual Defendants knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

125. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other Class members suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period. Arlo and Individual Defendants are liable for damages in connection with these losses under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT IV**
**(Violations of Section 20(a) of the Exchange Act**
**Against NETGEAR and the Individual Defendants)**

126. Lead Plaintiff repeats and realleges the allegations contained in paragraphs 1 to 98 above, as if fully set forth herein.

127. During the Class Period, the Individual Defendants and NETGEAR participated in the operation and management of Arlo, and conducted and participated, directly and

indirectly, in the conduct of Arlo's business affairs.  Because of their senior positions and directorships and control of the Company, and the significance of Arlo's development and sale of its flagship products, they knew the adverse non-public information about Arlo.

128.    As officers and directors of a publicly owned company, or position as the controlling shareholder, these Defendants had a duty to disseminate accurate and truthful information with respect to Arlo's reports and filings and to correct promptly any public statements issued by Arlo that had become materially false or misleading.

129.    The Individual Defendants and NETGEAR are controlling persons of Arlo within the meaning of Section 20(a) of the Exchange Act.

130.    Because of their positions of control and authority as senior officers and directors, or controlling shareholder, these Defendants were able to, and did, control the contents of the reports and public filings that Arlo disseminated in the marketplace during the Class Period concerning its financial results and internal controls.  Throughout the Class Period, these Defendants exercised their power and authority to cause Arlo to engage in the wrongful acts complained of herein.

131.    As control persons, NETGEAR and the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the primary violations of the Exchange Act committed by Arlo as set forth in Count III.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

1        C. Awarding Lead Plaintiff and the other members of the Class prejudgment and post-

2    judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

3        D. Awarding such other and further relief as this Court may deem just and proper.

4    **JURY TRIAL DEMANDED**

5        132.    Plaintiff hereby demands a trial by jury.

6

7    Dated: February  13,  2020

8            /s/_____Aaron M. Zigler_____

9            BROWNE GEORGE ROSS LLP
     Eric M. George

10           Carl Alan Roth
     Ryan D. Evans

11           **KELLER LENKNER LLC**

12           Ashley C. Keller (*admitted pro hac vice*)
     Aaron M. Zigler